593 F.2d 1155
 99 L.R.R.M. (BNA) 2640, 193 U.S.App.D.C. 1,
84 Lab.Cas. P 10,830
 DISTRICT 65, DISTRIBUTIVE WORKERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Hartz Mountain Corporation, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
The HARTZ MOUNTAIN CORPORATION, Respondent,
District 65, Distributive Workers of America, Intervenor.
 Nos. 77-1239, 77-1367.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 4, 1978.
Decided Sept. 26, 1978.
 
 1
 Andrew Tranovich, Atty., N. L. R. B., Washington, D. C., a member of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court with whom John S. Irving, Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief, for the National Labor Relations Board, petitioner in No. 77-1367 and respondent in No. 77-1239.
 
 
 2
 Lewis M. Steel, New York City, with whom Eugene G. Eisner, New York City, was on the brief, for District 65, Distributive Workers of America, petitioner in No. 77-1239 and intervenor in No. 77-1367.
 
 
 3
 Seymour Goldstein, New York City, a member of the bar of the Supreme Court of New York, pro hac vice, by special leave of Court with whom Fred F. Fielding and James Skelly Wright, Jr., Washington, D. C., were on the brief, for The Hartz Mountain Corporation, respondent in No. 77-1367 and intervenor in No. 77-1239.
 
 
 4
 Also Lorin H. Bleecker, Washington, D. C., entered an appearance for petitioner in No. 77-1239.
 
 
 5
 Before BAZELON and MacKINNON, Circuit Judges, and JAMESON,* Senior District Judge.
 
 
 6
 Opinion for the court filed by JAMESON, District Judge.
 
 
 7
 Opinion filed by BAZELON, Circuit Judge, concurring in part and dissenting in part.
 
 JAMESON, District Judge:
 
 8
 These consolidated cases are before the court upon the petition of the National Labor Relations Board for enforcement of an order against The Hartz Mountain Corporation and the petition of District 65, Distributive Workers of America, the charging party, to review portions of the Board's order. District 65 is an intervenor in the N.L.R.B. petition, and Hartz is an intervenor in the District 65 petition.
 
 
 9
 Following a 58 day hearing, an administrative law judge issued his decision, comprising 179 pages, with detailed findings of fact and conclusions of law, and a recommended order. The judge found: that Hartz (1) had violated Sections 8(a)(2) and (1) of the National Labor Relations Act as amended, 29 U.S.C. § 158(a)(2) and (1), by its recognition of Local 806 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and its subsequent execution of collective bargaining agreements with that union; (2) had violated § 8(a)(3) and (1) by its mass discharge of 46 employees; and (3) had violated § 8(a)(1) by issuing disciplinary warnings and docking the pay of eight employees for engaging in a protected activity; but that (4) it had not been established that 12 other employees were discharged in violation of the Act; and (5) that two employees were discharged for good cause. The recommended order required Hartz to withdraw its recognition of Teamsters Local 806, to offer reinstatement with back pay to the 46 employees, and to reimburse District 65 for its organizational expenses and counsel fees.
 
 
 10
 The Board adopted the findings, conclusions and recommended order of the administrative law judge with two exceptions: (1) it found that the firing of the 46 employees also violated § 8(a)(3) of the Act, and (2) it deleted the provision for payment of expenses and counsel fees to District 65.
 
 
 11
 District 65 in its petition challenges only the failure of the Board to order reinstatement of the 14 employees and reimbursement of District 65 for its organizational and legal expenses. Hartz opposes the Board's petition for enforcement of its order and District 65's petition for review.
 
 I. BACKGROUND
 
 12
 We summarize briefly the factual background set out in detail in the decision of the administrative law judge, adopted by the Board:
 
 
 13
 On May 11, 1973, a decertification election was conducted by the Board at Hartz' Jersey City, New Jersey plant, pursuant to which Local 888, Retail Clerk's International Association was decertified as the bargaining representative of the employees at that plant. Local 888 immediately began a campaign to obtain recertification and by August had procured over 300 authorization cards from the 400 plus employees. James Lucas, Local 888's Business Agent, contacted Hartz vice-president Gilbert Kaye and demanded recognition, offering to submit the cards for an impartial "card check". Kaye rejected this request on the ground that under the National Labor Relations Act, Hartz was free to decline to recognize a bargaining agent for its employees for a period of one year following decertification.[1]
 
 
 14
 On May 16, 1973, District 65 held a meeting attended by about 100 employees, at which an Employees Organizing Committee of 15 members was elected.[2] The Committee sponsored several employee meetings and solicited members during their free time. In addition, District 65 representatives actively campaigned outside the plant gates to attempt to attract employees to membership.[3] When they had procured what they thought to be a sufficient number of authorization cards, District 65 representatives contacted Hartz by mail, demanding recognition and offering to demonstrate the union's majority status. When no reply was received, District 65 representatives contacted Hartz plant manager John Petrera, who told them that any decision on recognition would have to come "from Harrison", I. e., from Hartz corporate headquarters, in Harrison, New Jersey.
 
 
 15
 District 65 continued its organizational efforts and continued to await a response from Hartz.[4] On July 10, 1973, District 65 again requested recognition in a telephone conversation with Hartz' counsel. Counsel denied this request eight days later, asserting a "good faith doubt" in District 65's alleged majority status. District 65 thereafter continued its organizational activities in front of the plant. The possibility of a recognitional strike was again discussed at an employee meeting on July 25. On advice of counsel, the strike idea was discarded, and an interim hospitalization plan was set up.[5] In late August, the Employee Organizing Committee met with plant General Manager Feinberg and Personnel Manager Morales. Feinberg assured the Committee that employee problems would be cleared up in the near future. He also stated that Hartz would decline to recognize any union for one year following the decertification of Local 888.
 
 
 16
 The inability of the employees to gain recognition of a union to aid in the negotiation of a hospitalization plan and other benefits resulted in frustration among the members of the Committee. Finally in mid-November, Juan Vazquez, a member of the District 65 Committee, went "to Harrison to see about another union". On November 16, members of the Committee were allowed to leave work an hour early to discuss and meet with Teamster representatives at the home of committee member Concepcion Pastrana. On two occasions that day, Vazquez was heard to say that Hartz would not accept either District 65 or Local 888, but that International Brotherhood of Teamsters Local 806 could gain earlier recognition. At the meeting Vazquez brought in two Local 806 business agents, Calagna and Gonzales, who presented the Teamsters' case. After the business agents left, however, the Committee agreed to continue its support for District 65.
 
 
 17
 Vazquez and four other Committee members then withdrew their support for District 65 and began a campaign on behalf of Local 806. Vazquez solicited authorization cards for Local 806 on company time. He was allowed to solicit cards from new job applicants, telling them that Local 806 was the union which would represent them. Applicants were told that signature of a Local 806 card was a precondition to employment. Vazquez and the other supporters of Local 806, who included at least one supervisory employee, engaged in coercive tactics to procure cards. For example, employees were told that Local 806 was their bargaining agent, and that employees who failed to sign with Local 806 would be discharged.
 
 
 18
 On November 26, after ten days of organizational campaigning, Local 806 met with Kaye and demanded recognition. After the employees present executed a certificate that they represented the plant employees, Kaye agreed to consider the demand for recognition upon proof of majority status. The union representatives met with Kaye, Feinberg, and Morales on November 30 to attempt to establish majority status. Calagna gave Kaye a stack of authorization cards, asserting that they represented the views of a majority of the employees.[6] Kaye did not count the cards or handle them in any way.[7] He did agree to forward a recognition agreement to the Hartz management for consideration. Hartz vice-president James O'Connor signed the agreement on December 3, again without counting the cards or otherwise verifying the alleged Teamster majority. Hartz thereafter entered into two contracts with Local 806 covering substantially all the employees in the Jersey City plant. Each contract contained union-security mandatory membership requirements.
 
 
 19
 On November 29, District 65 filed the unfair labor practice charge against Hartz, alleging that Hartz was engaged in a consistent practice of unlawful aid and support for Local 806. The charge was subsequently amended to include allegations that approximately 60 District 65 adherents were unlawfully discharged and that eight employees were wrongfully disciplined for engaging in protected activities.
 
 II. RECOGNITION OF LOCAL 806
 
 20
 The Board agreed with the conclusion of the administrative law judge that Hartz "unlawfully aided, assisted and supported" Local 806 and that Hartz' recognition of that union, when it "did not represent an uncoerced majority" of the employees, and "while substantial real questions concerning the representation" of the employees existed, was an unfair labor practice under § 8(a)(1), (2) of the Act, 29 U.S.C. § 158(a)(1), (2).[8] The Board based its conclusion on the findings that (1) Hartz supervisors solicited Local 806 membership cards; (2) Vazquez and other Local 806 adherents were allowed to solicit authorization cards on company time; (3) Local 806 organizers were given access to the plant for organizational purposes; and (4) Hartz hastily recognized Local 806 when the union did not have the support of a majority of the employees in the appropriate unit. We find substantial evidence in the record to support these findings, and agree that they justify the conclusion that Hartz' unlawful aid and support for Local 806 constitutes an unfair labor practice.
 
 
 21
 We note initially Hartz' differing responses to the organizational campaigns of the three unions. Both District 65 and Local 888 made repeated unsuccessful attempts to gain recognition as bargaining agent for Hartz' employees in the course of recognition campaigns covering several months. Both unions offered to submit their authorization cards for a check by an impartial observer. This is significant in light of the fact that on at least one occasion District 65's demand for recognition was denied on the basis of a "good faith doubt" as to the Union's majority status. In contrast, Hartz entered into a recognition agreement with Local 806 upon receipt of the first demand for recognition, and after that union had been campaigning for less than two weeks. Recognition was granted despite the claim of each of the other unions that it in fact commanded majority support. Further, it is undisputed that at no time did either the union or Hartz officials verify that the cards presented by Local 806 represented the views of a majority of the employees in the bargaining unit. Hartz' blunt rejection of the demands of two unions and its precipitate recognition of a third hardly exemplifies the policy of strict neutrality required by the Act in situations where rival unions seek recognition.[9] See NLRB v. Signal Oil and Gas Co., 303 F.2d 785, 786 (5 Cir. 1962), citing Midwest Piping and Supply, Inc., 63 NLRB 1060 (1945).
 
 
 22
 While Hartz' differing responses to the three unions might not be sufficient in itself to constitute a violation of the Act, the record as a whole supports the Board's conclusion that Hartz gave unlawful aid and support to Local 806's organizational campaign. The testimony of employees Cansing, Aguirre, and Lorenzano establishes that Plant Manager Feinberg and Personnel Manager Morales[10] attempted to induce employees to sign authorization cards for Local 806 by making either promises or threats.[11] Several witnesses, some of whom were Hartz supervisory employees, testified that Local 806 adherents and organizers were permitted to engage in organizational activities in the plant on company time in violation of Hartz' "no solicitation" rule.[12] There is, as Hartz points out, evidence contrary to these findings. The administrative law judge, however, made specific and detailed findings as to the credibility of the witnesses on whose testimony he relied in his ultimate findings of fact. His credibility findings were accepted by the Board.[13] From our review of the record we conclude that the testimony upon which he relied was not inherently incredible. Giving due reference to the findings of the administrative law judge and the Board, our inquiry can go no further. NLRB v. Pittsburgh S.S. Co., 337 U.S. 656, 659-60, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949); Truck Drivers Local 705 v. NLRB, 166 U.S.App.D.C. 92, 93, 509 F.2d 425, 426 (1974).
 
 
 23
 Hartz characterizes its conduct as "isolated acts of lawful employer cooperation" which, even if found to be coercive, did not affect enough authorization cards to taint Local 806's alleged majority status. On the contrary, the Board found, and we agree, that Hartz' aid to and support of Local 806 pervaded that Union's campaign from beginning to end, and that this support violates § 8(a)(1) and (2) of the Act, 29 U.S.C. § 158(a)(1), (2). Local 806's organizational campaign was begun only after Vazquez "went to Harrison" to discuss another union. Vazquez returned with the news that Hartz management would not deal with District 65 or Local 888, but would recognize Local 806. Vazquez and his companions on the Local 806 committee were apparently given free rein to conduct their organizational campaign on company time, despite Hartz "no solicitation" rule. Company time was also set aside for other Local 806 campaign activities,[14] and Local 806 officials were allowed in the plant on working time. As noted Supra, recognition was extended to Local 806 after less than two weeks campaigning, without even a count of the authorization cards. Finally, after Hartz and Local 806 entered collective bargaining agreements in the face of protests and unfair labor practice charges from the two rival unions, the employees on the Local 806 committee received wage increases far in excess of those granted to other employees, under circumstances which were found by the administrative law judge to "smack of rewards for services rendered in helping to esconce (sic) a union of (Hartz') choice." While any one of these elements might, in a different case, be found to be permissible employer cooperation, we are constrained to view the totality of circumstances in evaluating the effects of employer assistance. International Association of Machinists, etc. v. NLRB, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940). When we do so, the conclusion is inescapable that Hartz' aid and support of Local 806 was widespread, pervasive, and in violation of the Act.
 
 
 24
 Hartz argues that the General Counsel must demonstrate that the improper activities of the employer affected a sufficient number of employee authorization cards to destroy the majority status of the recognized union. It is true, of course, that the General Counsel must show the nature and extent of the employer's improper activities and its likely impact upon the employees so that the Board and this court may determine whether the conduct was sufficiently pervasive to taint the union's majority status. It is not necessary, however, that this impact be established with mathematical certainty. We agree with the approach taken by other circuits, that proof of a pattern of employer assistance may provide sufficient circumstantial evidence to justify the inference that the union's majority support is tainted. Amalgamated Local Union 355 v. NLRB, 481 F.2d 996, 1002 n. 8 (2 Cir. 1973); Department Store Food Corp. v. NLRB, 415 F.2d 74, 77 n. 4 (3 Cir. 1969); NLRB v. Clement Bros. Co., Inc., 407 F.2d 1027, 1029-30 (5 Cir. 1969).[15] The Board properly drew such an inference in the instant case, stating that Hartz' "numerous acts of unlawful assistance to Local 806 render the authorization cards obtained by that Union unreliable as indicators of employee choice".
 
 
 25
 The Board drew additional support for its conclusion from its finding that Local 806 was a minority union on the date of recognition. We agree with the administrative law judge, however, that this finding is unnecessary to a decision in this case. As the judge noted, under all the circumstances, including the large number of authorization cards signed for each union,[16] "it is not feasible or possible to arrive at a rational or absolute determination as to which, if any, of three competing unions here commanded the allegiance of a majority of the unit employees". Accordingly the judge concluded that it was improper for the company to "preempt that determination in the arbitrary, high-handed and unfair manner which it employed".
 
 
 26
 Employer recognition of a union is as much an unfair labor practice when the union has majority support procured by employer assistance as when the union in fact lacks majority support entirely. See NLRB v. Clement Bros. Co. Inc., 407 F.2d 1027, 1029 (5 Cir. 1969); cf. ILGWU v. NLRB (Bernhard-Altmann Corp.), 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The record supports the Board's finding that Hartz engaged in a pervasive campaign of support for Local 806 and the Board's conclusions that employee support for the union was tainted by the Company's unlawful assistance and Local 806 did not represent an "uncoerced majority" of the employees.[17] On this basis we grant enforcement of the portion of the Board's order dealing with the recognition issue.
 
 III. EMPLOYEE DISCHARGES
 
 27
 From March through August, 1974, Hartz discharged a large number of employees, 60 of whom were alleged to be the victims of unlawful discrimination. In extensive and detailed findings the administrative law judge reviewed the evidence as to each discharged employee. On the basis of these findings the Board concluded that in the termination of the employment of 46 employees Hartz discouraged membership in District 65 and encouraged membership in Local 806 in violation of § 8(a)(3) of the Act; unlawfully assisted Local 806 in violation of § 8(a)(2) of the Act; and interfered with, restrained, and coerced employees in violation of § 8(a)(1) of the Act. The Board concluded further that it had "not been established by substantial credible evidence upon the record as a whole", that Hartz' termination of the remaining 14 employees was in violation of the Act. Two of the 14 were found to have been discharged for cause unrelated to their union activities.
 
 A. Discriminatory Discharge of 46 Employees
 
 28
 The Board found that Hartz terminated 46 employees because of their adherence to District 65 and their refusal to join or support Local 806. Hartz contends that (1) there is no evidence that it had knowledge of the current union affiliation of any of the alleged discriminatees; (2) it had "substantial and legitimate business reasons" for each termination; and (3) the terminations were neither "inherently destructive of employee rights" nor motivated by a discriminatory purpose.
 
 
 29
 The administrative law judge found that Hartz had knowledge of the identity of the District 65 supporters, either through the authorization cards delivered to the company on April 11, 1974 or through observation of its supervisory employees. The judge credited testimony from the 46 dischargees to establish discriminatory intent. Their testimony differed in some particulars, but generally established that they were summoned to the plant cafeteria, singly or in groups, and informed that they had a choice of either affiliating with Local 806 or facing termination. The plant public address system was often used to summon the employees, and the plant manager was often present. The 46 discharged employees resisted this coercion and were later terminated. To recite in detail the testimony of the employees witnesses would unduly lengthen this opinion and would serve no useful purpose. We are convinced that the record supports the Board's conclusion that Local 806 was engaged in its activities to enforce the security clause of the contracts with the knowledge and assistance of Hartz, and that a prima facie case of unlawful discrimination was made.
 
 
 30
 Hartz argues that the discharges were justified by either substantial business reasons or poor work performance. Hartz vice-president Kaye testified that during the period in question the company was in a financial decline which required a reorganization of its production operations, with a concomitant lay-off of employees. He testified further that he personally decided which employees to terminate based on reports from high-level supervisors at the Jersey City plant and on his personal review of the personnel folders of the employees.
 
 
 31
 The administrative law judge discredited Kaye's testimony that the discharges were due to business retrenchment and found that under admitted facts less qualified employees were in many instances retained, many new employees were hired while the 46 discriminatees were terminated,[18] none of the "laid off" employees were recalled, and the economic justifications offered were belatedly added to Hartz' answer to the complaint by amendment during the trial. While the judge's inference of incredibility is not compelled, we agree that it is warranted by the evidence, and we will not disturb it.
 
 
 32
 The Board likewise found no justification for Hartz' contention that "poor work performance" was the basis of the discharge of the 46 employees. On the contrary, the administrative law judge, following his analysis of the work records of each of the employees, noted, Inter alia, the "fact that, without explanation, no line supervisors were produced by the Employer to testify to dispute or refute the testimony of the terminated employees as to lack of criticism or fault found with their work", and "the precipitate nature of the terminations and the manner in which they were effected for what was in most cases long-term, satisfactory employees".[19]
 
 
 33
 Kaye's testimony that he personally reviewed each personnel file and ordered the discharges on the advice of plant supervisors was strongly discredited.[20] At the time the alleged file review took place, there were, according to Hartz Personnel Manager Levy, no centralized personnel files at Hartz' Harrison headquarters. Hartz did not call any official other than Kaye or any supervisor to testify as to the poor work performance of these employees.[21] The only supervisor who testified, Domingo Negron,[22] was called by the General Counsel. He testified that neither he nor the other supervisors knew why their employees were being discharged; that no one asked his opinion on their work performance; that he found no fault with the work of these employees who were working for him; and that he was informed by General Manager Feinberg that the discharges were upon "orders from Harrison".
 
 
 34
 On the basis of this testimony and other inconsistencies in the evidence presented by Hartz,[23] the administrative law judge concluded that the offered justifications were mere pretext and insufficient to rebut the prima facie case of discrimination. From our review of the record we find substantial support for this conclusion. The portion of the Board's order finding discriminatory discharge of 46 Hartz employees will therefore be enforced.[24]
 
 B. Discharge of 12 Employees
 
 35
 The Board concluded that it "was not established by substantial credible evidence upon the record as a whole" that 12 employees had been discharged in violation of the Act. This court has held that the Board's determination that there has been no violation of the Act "must be upheld unless it has no rational basis". ILGWU v. NLRB, 150 U.S.App.D.C. 71, 83, 463 F.2d 907, 919 (1972). Findings of the Board should not be disturbed unless they "are irrational or unsupported by substantial evidence". Oil, Chemical and Atomic Workers International Union, Local 4-243 v. NLRB, 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966).
 
 
 36
 District 65 contends that there is no legal justification for drawing a distinction between these 12 employees and the 46 who were granted relief, and that relief was denied in the 12 cases solely by reason of the fact that none of these employees testified regarding the circumstance of his or her dismissal. District 65 argues that neither principle nor common sense requires that each employee fired in a mass discriminatory discharge testify in order to secure reinstatement. While we might agree with this statement as a broad general principle, we do not believe it is applicable under the circumstances of this case.
 
 
 37
 This is not a case in which a group of employees was unlawfully terminated in one discrete action by the employer. Rather approximately 308 employees were terminated over a span of nine months. Of this group over 100 were District 65 supporters, as evidenced by signed authorization cards. Yet the General Counsel brought charges with respect to only 60. The Board made individual detailed findings as to each of the 60. The contention that the Board's award of relief to the 46 employees rested solely on a conclusion that they were part of a class of District 65 members subject to unlawful discrimination is incorrect. The General Counsel did not include some 60 District 65 members in his charge and the administrative law judge made specific findings with respect to each of the 60 who were charged.
 
 
 38
 Two of the 12 employees did in fact testify at the hearing. One of them, Jose Maisonet, had worked for about five and one half months. The administrative law judge found "slight indication of activity on behalf of District 65 other than mere membership therein and wearing its button" and a "seemingly atypically long list of attendance defalcations disclosed by his personnel record considering his short term of employment". With respect to the other employee who testified, Wilfredo Lorenzana, the administrative law judge found "no indication of any protected concerted activities" on his part and that his personnel file "indicated that he received two work warnings" and "what appears to be an atypically poor attendance and punctuality record during his short 43/4 month tenure of employment".
 
 
 39
 With respect to the remaining 10 employees, who did not testify, the administrative law judge found no indication that one of them, Maria L. Sanchez, was a member of any of the unions and that her personnel folder "discloses, among other things, a seemingly extremely poor attendance and punctuality record". As to the remaining nine employees, the administrative law judge found generally no indication of any District 65 activity other than membership. In addition he found that Francisco Altamirano, who had worked about five months had an "arguably poor attendance and punctuality record, as well as a warning during his short-term employment". Fulvia Benjumeda, who had worked for two years and five months was also found to have an "arguably unsatisfactory punctuality and attendance record".
 
 
 40
 Each of the 46 employees the Board ordered to be reinstated was found to have been an active supporter of District 65 and a victim of coercive demands to abandon District 65 and embrace Local 806. In contrast, none of the 12 alleged discriminatees were shown to be active supporters of District 65. Rather the record reflects little more than mere membership.[25] The record contains no evidence of any pressure or threat against any of these 12 employees to join Local 806 or be fired. This case is thus distinguishable from Riley Stoker Corp., 223 NLRB No. 178, 92 LRRM 1110 (1970), on which District 65 heavily relies. In that case, unlike this one, the administrative law judge specifically found that the three discharged employees were terminated under identical unlawful circumstances. Here no such finding was, or could be, made.
 
 
 41
 It is undisputed that the burden is on the general counsel to prove unlawful discharge. NLRB v. Patrick Plaza Dodge, Inc., 522 F.2d 804 (4 Cir. 1975). We cannot say that the conclusion of the Board that it was "not established by substantial credible evidence" that any of the 12 employees had been discharged in violation of the act was either "irrational" or "unsupported by substantial evidence". See ILGWU v. NLRB, supra, Oil, Chemical and Atomic Workers International Union v. NLRB, supra.
 
 C. Peguero and Bueno
 
 42
 District 65 also contends that the other two discharged employees, Jose Peguero and Rafael Bueno, two active adherents of District 65, were unlawfully terminated. It is undisputed that both men were known to Hartz to be District 65 supporters.
 
 
 43
 Peguero was discharged on December 10, 1973 after he had urinated on the plant floor in the area where he worked. The Board could properly conclude from the evidence that this was the reason for his termination and that Peguero's adherence to District 65 did not influence the decision to discharge him.
 
 
 44
 Bueno was discharged on January 3, 1974 for a variety of reasons, including repeated absences from work, insubordination to supervisors, "freshness" with female employees, and other work shortcomings. The incident which precipitated his discharge was his leaving work at noon on December 27, 1973 and failing to return until January 3, 1974. Both his foreman and supervisor testified that this absence was unauthorized. At the request of his supervisor, Bueno's employment was terminated. Although Bueno's testimony conflicts with that of the other witnesses, the administrative law judge credited those witnesses. We do not find their testimony inherently incredible and therefore accept the Board's finding.
 
 
 45
 There was ample cause for the discharge of both Peguero and Bueno. Mere activism in union affairs does not insulate an employee from discharge for any reason other than the employee's union activity. See NLRB v. Bangor Plastics, Inc., 392 F.2d 772, 776-77 (6 Cir. 1967). An employee may be discharged for any reason without violating the Act, as long as the discharge is not motivated by anti-union reasons. NLRB v. Waterman S.S. Corp., 309 U.S. 206, 218-19, 60 S.Ct. 493, 84 L.Ed. 704 (1940). We conclude that the Board properly evaluated the evidence in determining the motivation for the discharge of both Peguero and Bueno.
 
 IV. DISCIPLINE OF EIGHT EMPLOYEES
 
 46
 On numerous occasions in July, 1974, eight production workers requested their supervisor, Hector Santiago, to supply them with an electric fan to alleviate the intense heat in their work area. The requests were ignored. On August 2, the employees again requested a fan and were informed by Santiago that no fans were available. The eight employees then left their work station and went to Plant Manager Petrera to request a fan. Within ten minutes three fans were provided. The employees were gone from their work station about 15 minutes.
 
 
 47
 On August 4, Hartz issued formal disciplinary warnings to each of the eight employees and docked them 15 minutes pay for leaving their work without authorization. The Board found that they did so in the course of engaging in concerted activity for their mutual aid and protection under § 7 of the Act, 29 U.S.C. § 157, and that the disciplinary warnings were therefore in violation of the employees' rights under § 8(a)(1), 29 U.S.C. § 158(a)(1).
 
 
 48
 Section 7 provides that employees have the right to engage in "concerted activities for the purpose of . . . mutual aid or protection". These rights extend beyond formal union activities and include concerted activities of the type engaged in here, where the employees found it necessary to present their demands as a group[26] in order to secure relief from intolerable working conditions. NLRB v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).[27]
 
 V. ORGANIZATIONAL COSTS AND COUNSEL FEES
 
 49
 The administrative law judge concluded: "In view of all of the circumstances of this case, including the unusually protracted, complex, and difficult nature of the proceedings . . . all growing out of Respondent's precipitate, unlawful recognition of Teamsters Local 806, in contrast to its refusal to even meet with Distributive Workers District 65 to enable that Union to demonstrate is alleged representation credentials, in my opinion fairness requires the reimbursement of Distributive Workers District 65 for its organizing expenses and reasonable counsel fees, and I shall so recommend."
 
 
 50
 In modifying the recommended order to delete the requirement for reimbursement of District 65's counsel fees and organizational expenses, the Board said in part: "We conclude that Respondent's defenses in this proceeding are not patently frivolous and consequently, in accord with our usual policy, this extraordinary remedy is not warranted in this proceeding. Cf. Heck's, Inc., 215 NLRB 765 (1974)."
 
 
 51
 In Heck's, Inc., following remand from the Supreme Court (NLRB v. Food Store Employees Union, Local 347, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974)), for clarification of the Board's policy with respect to extraordinary remedies, the Board made it clear that awarding organizational costs and fees was limited to cases where employees assert "patently frivolous defenses", and that litigation expense is not recoverable where the defenses "are 'debatable', that is, for example, where they are dependent upon resolutions of credibility".[28] Here the administrative law judge and the Board made numerous credibility determinations. We agree with the Board that the Hartz defense was not frivolous,[29] even though its conduct was found to be in violation of the Act.
 
 VI. CONCLUSIONS
 
 52
 We conclude that the petition of District 65 should be denied and that the Board's order should be enforced in its entirety.
 
 
 53
 BAZELON, Circuit Judge, concurring in part and dissenting in part:
 
 
 54
 I fully concur in Parts I-IV of Judge Jameson's opinion. However, on this record I am unable to join the court in affirming the Board's decision rejecting the Administrative Law Judge's (ALJ) recommended award of fees and expenses to District 65.
 
 
 55
 Congress has given the NLRB considerable discretion in fashioning remedies to effectuate the policies of the National Labor Relations Act.[1] Moreover, the award of fees and expenses is an extraordinary remedy.[2] Nonetheless, the facts of this case suggest that, at a minimum, the Board's decision should have addressed the record more carefully and clearly in modifying the remedial aspect of the ALJ's recommended order.
 
 
 56
 The Board has made clear that the award of fees and expenses is not a punitive tool to be used against repeated violators of the Act,[3] but rather serves to deter abuse of the Board's processes, such as frivolous litigation pursued only for the purpose of delay.[4] At the same time, fee awards should not create a disincentive to the assertion of good faith defenses.
 
 
 57
 The Board has thus articulated a rationale for awarding fees which bears a strong resemblance to the equitable doctrine that "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons' " in the course of the litigation, a court may award fees to the prevailing party.[5]
 
 
 58
 The ALJ's careful and thorough opinion is replete with evidence that suggests that the company's conduct in the Board proceedings constituted just such "bad faith." Repeatedly the ALJ noted direct and inexplicable self-contradictions in the testimony of key witnesses for the company.[6] After noting instance after instance self-contradiction in the testimony of company Vice-President Kay, the ALJ observed: "This is but another example of what might be regarded as a penchant for misleading with words or a high degree of carelessness with candor and accuracy."[7]
 
 
 59
 The Board has held that "where the merit of (a defense) in the last analysis rests upon a trial examiner's resolution of credibility" an award of attorneys fees would be improper because it would discourage legitimate resort to the Board's processes.[8] But to permit a party to defeat an award of fees simply by exhibiting "carelessness with candor" would render meaningless the Board's attempt to discourage frivolous litigation through the remedy of fee awards endorsed in Heck's, Inc., 215 N.L.R.B. 765 (1974) (Heck's II ) and Tiidee Products, Inc., 194 N.L.R.B. 1234 (1972).
 
 
 60
 It is true that, in his "Conclusions of Law", the ALJ did not point with any precision to the company's conduct during the hearings as a basis for his recommendation that the company reimburse District 65's expenses. Nonetheless, the ALJ's opinion is hardly silent on this point, as is clear from even a cursory review. And the Board's response to the ALJ's recommendation fails to illuminate with much clarity the basis of the Board's disagreement with the ALJ.[9] While the Board does have considerable discretion in this area, the talismanic characterization of the company's defense as "not patently frivolous", without more, gives us little guidance in determining whether the Board's conclusion reflects "reasoned decisionmaking."[10] As the Board itself has recognized in fashioning a remedy the Board must explicate the application of existing criteria to the case at bar.[11] Yet the Board's decision sheds no light on what aspects of the record support the conclusion that the company's defense was not frivolous.
 
 
 61
 In light of the Supreme Court's decision in NLRB v. Food Store Employees Local 347, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974), it would be inappropriate for us to exercise our authority under §§ 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and (f) (1976), and modify the Board's order to provide for the award of fees. Nonetheless, it is my view that a limited remand is necessary to elucidate the basis for the Board's decision not to accept the ALJ's recommended award.[12] In this connection, it may be appropriate for the Board to consider its own suggestion in Heck's II whether it "ought to apply some more definitive criterion than the distinction between 'debatable' and 'frivolous' defenses which thus far (the Board) has been utilizing."[13] Such a course would "effectuate the policies of the Act by making workable the system of restricted judicial review in relation to the wide discretionary authority which Congress has given to the Board"[14] and would help assure that future decisions on the award of fees are based on ascertainable and predictable criteria "without unreasonable discrimination."[15] Such, after all, is the essence of the rule of law.
 
 
 
 *
 Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970)
 
 
 [1]
 Under § 9(c)(3) of the Act, 29 U.S.C. § 159(c)(3), employees may not compel a certification election in a bargaining unit in which a valid election has been held within the preceding twelve months
 
 
 [2]
 A petition in support of District 65, signed by over 200 employees, was received at the meeting
 
 
 [3]
 The representatives remained outside in apparent respect for Hartz' "no solicitation" rule. There is no suggestion, however, that Hartz ever enforced the rule against either District 65 or Local 888
 
 
 [4]
 At a meeting on June 21 the employees were advised that the decertification election precluded recognitional picketing for one year (see § 8(b)(7)(B) of the Act, 29 U.S.C. § 158(b)(7)(B)), but that the company could voluntarily recognize District 65 after it had established its majority status
 
 
 [5]
 The plan later fell through when an insufficient number of employees requested coverage
 
 
 [6]
 Calagna testified, however, that at no time did he count the cards, nor did he know precisely how many employees were in the bargaining unit
 
 
 [7]
 Kaye testified that he declined to count the cards on the basis of Calagna's assertion that handling the cards in any way would be "tantamount to recognition" of the Teamsters. The administrative law judge discredited this testimony
 
 
 [8]
 § 8(a)(1), 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their right to choose a bargaining agent. § 8(a)(2), 29 U.S.C. § 158(a) (2), makes it an unfair labor practice for an employer to "contribute financial or other support to" a labor organization
 
 
 [9]
 The administrative law judge found that both Local 888 and District 65 had "engaged in substantial union organizational activity" from May through August, 1973, "to the knowledge of the Company"
 
 
 [10]
 Morales was responsible for the interviewing and hiring of prospective employees. There is testimony to support the Board's finding that he gave union cards to at least three prospective employees and told them to "fill them out", because the card was "from the union that was going to represent them . . .."
 
 
 [11]
 For example, employee Nelson Cansing testified that Feinberg told him that his promotion to supervisor was hindered by Cansing's membership in District 65
 
 
 [12]
 Supervisor Domingo Negron testified that he was aware of employee solicitation of cards on company time. He also stated that he saw Teamster organizers in the plant and asked Feinberg's permission to "chase them out", to which Feinberg replied, "No, leave them alone."
 
 
 [13]
 The Board noted that all of the parties had excepted to certain credibility findings made by the administrative law judge. Consistent with its established policy not to overrule an administrative law judge's "resolution with respect to credibility unless the clear preponderance of the relevant evidence convinces us that the resolutions are incorrect", the Board from a careful examination of the record found "no basis for rejecting his findings"
 
 
 [14]
 On December 7, after Hartz had extended recognition to Local 806, a meeting was held on company time in the plant cafeteria, at which approximately 400 employees were addressed by Teamsters representatives. At least eight Hartz supervisory employees, including Kaye and Feinberg, were also present. The meeting turned into a melee when the numerous militant District 65 supporters shouted down the Teamster officials
 
 
 [15]
 We find Hartz' attempts to distinguish these cases unpersuasive. Hartz argues that in Department Store Food Corp., "direct evidence existed that the very cards constituting the union's majority had been secured by coercion". To the contrary, the discussion which appears in 415 F.2d at 77 n.4 suggests that the company raised an argument identical in principle to the one raised here
 Petitioners contend that the evidence adduced at the hearing shows that no more than 26 employees could have been subjected to checking-in procedure . . . and therefore, assuming without conceding these signatures to be invalid, the remaining 32 signatures unaffected by the charge were sufficient to give a numerical majority to the union (out of a total of 58 employees).
 The court did not resolve this question by the "numbers game", but rather permitted the Board to infer that coercion of a minority of cards tainted the union's alleged majority.
 
 
 [16]
 A summary of the union affiliations, as of December 3, 1973, of 408 employees in Hartz' production unit shows that 88 had signed only with Local 806, 16 only with Local 888, 96 only with District 65, 43 with both 806 and 888, 66 with 806 and 65, 20 with 888 and 65, 36 with all three unions and 43 with none
 Hartz argues that the duplicate cards should be ignored since the cards for Local 806 were the last to be signed. It appears, however, that at least 39 duplicate cards were signed in November, i. e., the same "time frame" in which Local 806 obtained its cards.
 
 
 [17]
 Having reached this conclusion, it is unnecessary to consider the detailed analysis of employee cards presented respectively by the Board and Hartz. We do note, however, that the Board makes a persuasive showing, on the basis of specific cards held invalid and the signing of cards with a competing union during the same "time frame" as the Teamster Cards, that Local 806 did not have a majority status on the date of recognition
 
 
 [18]
 While terminating 312 employees Hartz also hired 288 more. The median length of employment of the 46 discharged employees was four and one-half years, whereas overall the plant median length of employment was only one year, two and one-half months
 
 
 [19]
 The administrative law judge noted some deficiencies in the work performance and attendance records of some of the discharged employees. He found, however, that the records of the discharged employees generally were not substantially different from those of the employees retained
 
 
 [20]
 The administrative law judge found Kaye's testimony to be characterized by "inconsistencies, lapses, alleged recollective failures, (and) carelessness under oath . . .."
 
 
 [21]
 The administrative law judge inferred that the testimony of missing witnesses would be unfavorable to the party who would be expected to benefit from their testimony. This was proper. International Union (UAW) v. NLRB, 148 U.S.App.D.C. 305, 312-13, 459 F.2d 1329, 1336-37 (1972)
 
 
 [22]
 Negron was a supervisor at the time of the discharges, but had been fired by Hartz prior to the hearing, allegedly for taking some scrap items from the plant. His testimony, however, was specifically credited by the administrative law judge
 
 
 [23]
 For example, reports filed with the State of New Jersey for unemployment insurance purposes often reflected reasons for discharge different from those offered by Hartz in this case
 
 
 [24]
 Hartz offers statistical data in an attempt to prove that District 65 employees were discharged at a rate which was proportional to their percentage of the Hartz work force. This evidence might be compelling if we viewed this as a mass discharge case. However, the General Counsel presented direct evidence of anti-union motivation in the discharge of these employees. The Board did not infer improper motivation on the basis of statistical data alone, and the statistics offered by Hartz do not rebut the direct evidence of improper motive on which the Board relied
 
 
 [25]
 Typical of the group of 46 is Dominga Cintron. The administrative law judge found that she was "a District 65 activist . . ., attending its meetings, wearing its distinctive button at work, discussing and promoting it with fellow-employees, and distributing not only its membership cards but also its literature and announcements of meetings". In contrast, Maria Cruz, who was one of the 12 employees, was found on the basis of the evidence presented to have engaged in no District 65 activity beyond "mere 'petitioning' and card signing"
 
 
 [26]
 Hartz argues that it was not necessary for all eight employees to leave their posts in order to secure the relief granted. However, § 9(a) of the Act, 29 U.S.C. § 159(a), allows employees to present their grievances to the employer at any time individually or as a group. In light of the repeated failure in their contacts with their supervisor, Santiago, and the immediate success of the group request to the plant manager, we conclude that the Board properly found the actions of the employees to be reasonable
 
 
 [27]
 Relying on NLRB v. Washington Aluminum Co., Inc., supra, Hartz argues that the employees were not engaged in a protected activity by reason of the no-strike clause in the bargaining agreement. Since the Company violated the Act in recognizing and entering into the collective bargaining agreements with Local 806, the no-strike clause was not binding on these employees
 
 
 [28]
 The Board said further: "The fact that in retrospect a respondent is found to have engaged in a flagrant repetition of conduct previously found unlawful, otherwise characterized as aggravated and pervasive, does not in our judgment justify our discouraging that respondent from gaining access to an appropriate forum where the credibility of witnesses leaves an unfair labor practice issue in doubt."
 
 
 [29]
 There is no finding or even suggestion in the decision of the administrative law judge that the Hartz defense was "frivolous". See also Eisenberg v. Hartz Mountain Corp., 519 F.2d 138, 143 (3 Cir. 1975), where the court vacated a temporary injunction issued upon the petition of the Regional Director of the National Labor Relations Board, concluding that on the record then presented it seemed "as likely as not that a majority of the Hartz employees freely chose to be represented by Teamsters Local 806"
 
 
 [1]
 NLRB v. Food Store Employees Local 347, 417 U.S. 1, 8, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974)
 
 
 [2]
 See, e. g., Heck's Inc., (Heck's II) 215 N.L.R.B. 765, 767 (1974)
 
 
 [3]
 Id. at 767, 768; Heck's Inc. (Heck's I), 191 N.L.R.B. 886, 889 (1971)
 
 
 [4]
 Tiidee Products Inc., 194 N.L.R.B. 1234, 1236 (1972):
 (F)rivolous litigation . . . is clearly unwarranted and should be kept from the nation's already crowded court dockets, as well as our own. While we do not seek to foreclose access to the Board and courts for meritorious cases, we likewise do not want to encourage frivolous proceedings. The policy of the Act to insure industrial peace through collective bargaining can only be effectuated when speedy access to uncrowded Board and court dockets is available.
 
 
 [5]
 Runyon v. McCrary, 427 U.S. 160, 183, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), quoting F. D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258-59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)
 
 
 [6]
 Illustrative examples abound throughout the ALJ's decision, E. g., Hartz Mountain Corp., 228 N.L.R.B. 492, 512 (1977):
 On cross-examination, (Company Personnel Manager) Morales retreated into his "I don't remember" pattern when asked so broad a question as whether he ever had any discussion with any employee concerning Teamsters Local 806; although Morales subsequently acknowledged informing employees that "normally, the contract had to have a security clause that called for the employees to join the union . . . ," he again pulled back into denial of ability to "recall" the occasion or context of, or any person involved in, any such remarks by him. In contrast we observe Morales' assertion in his July, 1974 affidavit to the United States District Court that "I did indicate on a few occasions that I thought the Teamsters were a good union, and that once a union achieved recognition, all employees would probably have to join that union or be fired." (CP Exh. 9, p. 4). After first denying that he ever discussed Distributive Workers District 65, Retail Clerks Local 888, or any other union, with any employee, Morales' attention was drawn to his statement in his District Court affidavit (Id.) that "Occasionally I would discuss unions with an employee at his initiative" and he was asked which unions; his response, characteristically, was that he does "not recall" and, further, that he could not "remember" how that information got into his affidavit to the District Court.
 And, Id. at 523 n.148:
 (Company Vice-President for Engineering and Labor Relations) O'Connor also conceded on the record at the trial that contrary to his July 22, 1974 affidavit to the United States District Court (GC Exh. 143, p. 1, para. "2(c)"), part of paragraph "29" of Kaye's affidavit to that Court (GC Exh. 138, p. 14) is Not true, and that O'Connor in effect misled the District Court in that Section 10(j) injunction proceeding by failing to state the true facts thereon (Trial transcript, pp. 5712-5718). Contrary also to his earlier testimony at this trial itself, O'Connor swore on cross-examination that he extended recognition to Local 806 for a "clerical and maintenance unit" Not on December 17 but on December 21.
 And, again, Id. at 517:
 But there is, again, as in so many instances and aspects of (Company Vice-President) Kaye's testimony, a degree of apparent incongruity if not outright inconsistency between his own statements in the record here. For example, although his stipulated (GC Exh. 114 ) "testimony" is that he "noticed that they (i. e., "some" of the Local 806 cards presented to him by Calagna on November 30) were signed and dated," his actual testimony is that he could see no dates on any but the top card and paid no attention to any dates; while he swore in his July 22, 1974 affidavit to the United States District Court that he "checked" a "random sample" (GC Exh. 138, p. 9) of those cards, he testified at the trial here that he did Not take a random sample; and while he swore to the District Court that he "looked" at "many" of the cards (Id.) and he testified here that he "thumbed through most" (later, "looked at"; still later, "didn't look at" but merely "thumbed through") of the cards in the batch, his stipulated testimony states that "I did Not look at most of the cards in the batch."
 
 
 [7]
 Id. at 523 n.146
 In my view, such factual contradictions, particularly in statements under oath to governmental authorities, like others elsewhere pointed out herein are substantial and serious, should be seriously regarded, and merit poor marks for their affiant's credibility if, indeed, not more serious consequences.
 Id. at 523 n.147.
 
 
 [8]
 Heck's I, supra, 191 N.L.R.B. at 889. The same principle applies with equal force under bad faith rationale for shifting fees in the courts. See, e. g., Runyon v. McCrary, supra, 427 U.S. at 183-84, 96 S.Ct. at 2601:
 Simply because the facts were found against the schools does not by itself prove that threshold of irresponsible conduct for which a penalty assessment would be justified. Whenever the facts in a case are disputed, a court perforce must decide that one party's version is inaccurate. Yet it would be untenable to conclude ipso facto that that party had acted in bad faith.
 
 
 [9]
 The Board's only discussion of this issue appears in footnote 2 of the Board's opinion, Hartz Mountain Corp., supra, 228 N.L.R.B. at 492 n.2 (1977)
 Respondent has excepted to the portion of the Administrative Law Judge's recommended Order which requires Respondent to reimburse District 65 for reasonable counsel fees and disbursements incurred in the course of this proceeding and for expenses incurred in connection with the organizing campaign at Respondent's Jersey City plant prior to December 1, 1973. We conclude that Respondent's defenses in this proceeding are not patently frivolous and consequently, in accord with our usual policy, this extraordinary remedy is not warranted in this proceeding. Cf. Heck's Inc., 215 NLRB 765 (1974). We shall therefore modify the recommended Order by deleting the reimbursement requirement.
 
 
 [10]
 Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), cert. denied 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [11]
 Heck's II, supra, 215 N.L.R.B. at 768
 
 
 [12]
 NLRB v. Food Store Employees Local 347, supra, 417 U.S. at 10, 94 S.Ct. at 2080:
 Thus, when a reviewing court concludes that an agency invested with broad discretion to fashion remedies has apparently abused that discretion by omitting a remedy justify in the court's view by the factual circumstances, remand to the agency for reconsideration, and not enlargement of the agency order, is ordinarily the reviewing court's proper course.
 
 
 [13]
 Heck's II, supra, 215 N.L.R.B. at 768
 
 
 [14]
 Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 196, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)
 
 
 [15]
 Greater Boston Television Corp. v. FCC, supra, 444 F.2d at 851